UNITED STATES OF AMERICA
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
Criminal Action No. 5:22-cr-00051-BJB-LLK

**UNITED STATES OF AMERICA**                                                            **PLAINTIFF**

**v.**

**ALAN C. ROGERS**                                                                               **DEFENDANT**

### REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's motion to suppress [Doc. 13], to which the United States responded in opposition [Doc. 16]. On April 18, 2023, the undersigned Magistrate Judge held an evidentiary hearing on the motion, and the transcript is at Doc. 23. The United States filed a post-hearing brief [Doc. 25], and Defendant filed a reply [Doc. 26]. The Court referred the matter to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636. [Doc. 14].

For the reasons below, the RECOMMENDATION will be that the Court GRANT Defendant's motion to suppress [Doc. 13].

### Chronology

Defendant resided in rural Livingston County, Kentucky in a "single wide trailer." [Doc. 13-2]. Surrounding the trailer were several "outbuildings," in which a person could hide. *Id.*

On November 5, 2018, a Parole Violation warrant issued against Defendant. *Id.*

In 2021, Defendant sold methamphetamine to a police informant at his residence. There were three such occasions -- on September 21, 2021, November 5, 2021, and December 8, 2021. [Doc. 23 at PageID.119, 122]. The informant reported being alone with Defendant on September 21, 2021, and on December 8, 2021, but on November 5, 2021, another purchaser was present. *Id.* at 144. Detective Richard Wright was lead investigator. *Id.* at 118.

On December 10, 2021, a devastating tornado tore through Western Kentucky. *Id.* at 124. The tornado "mandated a pause to affirmative criminal investigations." [Doc. 25 at PageID.214]. In May 2022, Detective Wright resumed the investigation. *Id.*

On May 25, 2022, Detective Wright secured a warrant to search Defendant's residence based on information that Defendant "knows he is wanted for the parole violation warrant and will not answer the door for the police and has mentioned that he will attempt to flee on foot." [Doc. 13-2]. The search warrant authorized police to "make entry into the home to arrest Rogers on the parole violation warrant as well as three more arrest warrants" and to search the "entire single wide trailer where Rogers uses as his residence," including any "closet inside the residence or outbuilding where Rogers could be occupying, hiding or residing." *Id.*

On May 26, 2022, the following seven police officers participated in Defendant's arrest: 1) Lead Detective Wright; 2) Trooper William Propes, 3) Sgt. Zachary Jones, 4) Detective Daniel Jones, 5) Detective Matthew Foster, 6) Trooper Thomas Williams, and 7) Chief Deputy Devin Brewer. These officers testified at the evidentiary hearing on April 18, 2023.

Lead Detective Wright briefed officers prior to execution of the search and arrest warrants, and Sgt. Jones was specially tasked with officer safety. [Doc. 23 at PageID.125, 171-72].

Trooper Propes drove the lead car onto Defendant's property. *Id.* at 90. Defendant was located roughly 20 yards from his residence. *Id.* at 155. Trooper Propes ordered Defendant to the ground, and Defendant complied. *Id.* Trooper Propes asked Defendant whether anyone else was on the property, and Defendant responded no. *Id.* at 100. Notwithstanding Defendant's response, Trooper Propes directed other officers to check the outbuildings for other individuals. *Id.*

Sgt. Jones and Detective Jones performed what the parties agree was a protective sweep (as opposed to execution of the first search warrant). *Id.* at 132. The protective sweep was initiated almost

immediately after entry of police officers on Defendant's property, and it was concluded about five minutes after Defendant was encountered. Id.

The protective sweep of Defendant's residence resulted in discovery in plain view on the kitchen table of a "clear plastic bag containing what appeared to be marijuana, rolling papers, a glass pipe that had a burnt white residue in it, and a set of triple beam scales." [Doc. 13-5]. "Also noted on the front porch table was a multi colored glass pipe used for smoking marijuana." Id.

Police secured Defendant's residence, and Detective Wright sought and obtained a second search warrant based on the items retrieved from Defendant's residence and the pipe noted on the front porch table. Id.

Execution of the second search warrant resulted in discovery of the items supporting the counts in this Court, i.e., 50 grams or more of methamphetamine, a Cobra .380 firearm and a Colt .357 firearm with an obliterated serial number. [Doc. 1].

**Defendant's motion to suppress presents the Court with a single issue.**

As stated above, Detective Wright secured the first search warrant based on information that Defendant "knows he is wanted for the parole violation warrant and will not answer the door for the police and has mentioned that he will attempt to flee on foot." [Doc. 13-2]. The first search warrant authorized police to "make entry into the home to arrest Rogers on the parole violation warrant as well as three more arrest warrants" and to search the "entire single wide trailer where Rogers uses as his residence," including any "closet inside the residence or outbuilding where Rogers could be occupying, hiding or residing." Id.

Apparently, the United States accepts that the first search warrant was conditioned upon needing to enter Defendant's residence to arrest him, but the condition did not apply because Defendant had already been arrested when Sgt. Jones and Detective Jones entered.

3

As stated above, the protective sweep of Defendant's residence resulted in discovery in plain view inside Defendant's residence of a "clear plastic bag containing what appeared to be marijuana, rolling papers, a glass pipe that had a burnt white residue in it, and a set of triple beam scales." [Doc. 13-5]. "Also noted on the front porch table was a multi colored glass pipe used for smoking marijuana." *Id.* Detective Wright sought and obtained a second search warrant based on the items retrieved from Defendant's residence and the pipe noted on the front porch table. *Id.*

The front porch table apparently was outside Defendant's residence (or at least, visible from outside Defendant's residence). Therefore, arguably, the "multi colored glass pipe used for smoking marijuana" provided probable cause for the second search warrant independently of the evidence found inside Defendant's residence as a result of the protective sweep. "[W]hen a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *United States v. Love*, 561 F. App'x 480, 484 (6th Cir. 2014). But pipes outside a residence are not "self-evidently drug paraphernalia (as they would be if found in someone's home with drug residue)." *Commonwealth v. Zamara*, No. 2014-CA-000663-MR, 2017 WL 1290671, at *1 (Ky. Ct. App. Apr. 7, 2017). "Simply calling them drug paraphernalia [or marijuana pipes], without more to go on, does not make them so, nor does calling them drug paraphernalia generate probable cause for a search warrant." *Id.*

The police report in this case states that the seized items included a "glass pipe with methamphetamine residue" and a "glass pipe used for smoking marijuana." [Doc. 13-1 at PageID.48]. Upon cross-examination, when confronted with the fact that the report mentioned methamphetamine but not marijuana "residue," Detective Wright acknowledged that, where the report "says 'used for smoking marijuana,' I didn't put that it had marijuana residue in it, but it did." [Doc. 23 at PageID.162]. But Detective Wright did not testify that he tested for marijuana residue.

4

Apparently, the United States accepts that, if the warrantless protective sweep was not justified, the second search warrant was tainted.

But even if the United States does **not** accept that the first and second search warrants were invalid (and did not justify entry into Defendant's residence), the United States has waived any claim based on the search warrants for two reasons. First, the United States did not make any such claim in its pre- or post-hearing briefs. [Doc. 16, 25]. Second, at the evidentiary hearing, the United States carried the burden of proof, and it offered insufficient supporting evidence. [Doc. 23].

Therefore, this Report finds/concludes that Defendant's motion to suppress [Doc. 13] presents the Court with a single issue, which is whether the warrantless protective sweep of Defendant's residence on May 26, 2022, was justified.

### Legal standards governing protective sweeps

Generally, search of a home or office is not reasonable under the Fourth Amendment without a warrant issued on probable cause. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). But there are exceptions. *Id.*

One such exception is that, "[d]uring a search incident to an arrest occurring inside a home, officers may 'as a precautionary matter and without probable cause or a reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *United States v. Colbert,* 76 F.3d 773, 776 (6th Cir.1996) (quoting *Buie* at 334). In addition, "officers may conduct a search more pervasive in scope when they have 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.*

The protective sweep exception to the warrant requirement arose in the context of an arrest in the arrestee's home. *See e.g. Buie*. As detailed above, Defendant was arrested outside his home.

5

The Sixth Circuit has not adopted a bright-line rule that a protective search is never justified when the arrest occurs outside the home. But the Sixth Circuit has held that, "where a defendant is arrested outside a home, 'a warrantless search of the [home] could be justified only if the officers had a specific, reasonable basis for believing ... that they were in danger from persons inside.'" *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir.1996) (quoting *United States v. Calhoun,* 49 F.3d 231, 234 n. 3 (6th Cir.1995)). "[I]n some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers," and "the fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers have a reasonable articulable suspicion that a protective sweep is necessary by reason of a safety threat." *Id.* at 777 (citing *United States v. Henry,* 48 F.3d 1282, 1284 (D.C.Cir.1995)).

Under *Colbert,* the perceived dangerousness of the individual to be arrested does not justify a protective sweep. *Id.* Instead, "[t]he facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual." *Id.* "If district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep." *Id.*

In *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), officers went to Archibald's residence to arrest him. Archibald resided in an apartment with a small porch. When Archibald answered the door, an officer pulled him off the porch and completed the arrest outside the apartment. Officers performed a protective sweep, which resulted in discovery of illegal drugs in plain view. The Sixth Circuit held that the protective sweep was not justified because the United States failed to show articulable facts warranting reasonable belief that Archibald's residence harbored an individual posing a danger to police. To show such facts, the United States was required to but failed to show more than the arrestee's "own dangerousness," "more than ignorance or a constant assumption" that another person was in the

6

residence, and more than a feeling of being "particularly vulnerable" due to physical position in relation to the residence. *Id.* at 299-300.

In *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004), the Tenth Circuit explained that the principle that the risk to officers diminishes substantially when the arrest occurs outside the arrestee's home goes back to *Buie*:

> The protective-sweep doctrine arose in the context of an arrest in a home. See, e.g., [*Maryland v. Buie*, 494 U.S. 325 (1990)]. Officers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home. The risk is substantially diminished when the officers effect the arrest outside the home. *See Id.* at 333 … ("An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."). Here, … the officers had no reason to believe a third person had stayed behind, or that such a person would attack them while they were outside. … Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*.

Typically, when the arrest occurs outside the arrestee's home, a protective sweep is justified only in limited circumstances:

> In some situations, the "potentiality for danger surrounding the arrest" may be so high that entry of premises to make a "protective sweep" will be permissible even though the arrest itself was not yet made or was achieved without entry. Typically, the reason no entry was made to arrest is because the police perceived the situation as a very dangerous one and thus took steps to cause the prospective arrestee to exit the premises and submit to arrest outside. Even with that person now in custody, the police may have good reason to doubt whether they can withdraw from the area with their prisoner without being fired upon, in which case an entry and "protective sweep" is justified. Such entries, if the sweep is promptly concluded, have been upheld when a weapon used in a recent crime by the arrestee or a weapon used by someone in firing at the police from those premises is as yet unaccounted for, when through an open door a weapon is actually seen within, and also when police have information the defendant was travelling with armed associates or that the defendant was armed and accompanied by another, as well as in similar circumstances.

W. LaFave, Search and Seizure § 6.4(c) ("the protective sweep"). In the present case, none of these limited circumstances applies, i.e., there was no unaccounted-for weapon used in a recent crime, no weapon seen within through an open door, and no information that Defendant was armed or with armed associates.

**Findings and Conclusions**

The Magistrate Judge finds and concludes as follows:

7

1. The parties do not indicate from whose perspective the reasonableness of the protective sweep should be judged. Plausible candidates include:

a. Detective Wright, who was the lead investigator and who briefed officers prior to execution of the warrants;

b. Sgt. Jones, who was specially tasked with officer safety and who (along with Detective Jones) performed the protective sweep of Defendant's residence; and

c. Trooper Propes, who arrested Defendant (or at least initiated his arrest) and who initiated protective sweep of the outbuildings.

This Report declines to resolve this issue because the present findings and conclusions are sufficiently broad to reflect that, from any or all perspectives, a protective sweep was not justified.

2. None of the seven officers who testified at the evidentiary hearing identified "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).

3. No officer testified that he observed another individual on the property or that he heard noises indicating that someone else was present. In fact, some evidence affirmatively indicates that no one else was present. Specifically, Detective Wright testified that he performed pre-arrest surveillance on the morning of May 26, 2022, to determine if someone else was on the property (to make sure it would be as safe as possible when the officers came to make the arrest). [Doc. 23 at PageID.156]. The fact that the arrest proceeded on May 26, 2022, suggests that no one else was present.

4. The last controlled purchase occurred in December 2021, and Defendant was arrested approximately five months later in May 2022. No officer testified that, at the time of his arrest, Defendant possessed or was selling illegal drugs from his residence. No officer testified that firearms would be present.

8

Admittedly, the police informant purchased a .22 caliber long rifle from Defendant in December 2021, and the informant allegedly saw firearms in Defendant's trailer on other occasions. [Doc. 23 at PageID.122, 147]. But Detective Wright testified that he did not consider the informant to be a reliable source because in December 2021 the informant stole some of the drugs used for the controlled purchase and lied about it. *Id.* at 140.

5. On May 26, 2022, police encountered the following vehicles on Defendant's property: a possibly inoperable white pickup truck in the grass and two motorcycles, one of which had a helmet on its back. [Doc. 23 at PageID.101, 153]. But there was no testimony that they belonged to someone other than Defendant. *Compare United States v. Stover*, 474 F.3d 904, 911-912 (6th Cir. 2007) (a vehicle parked in the defendant's driveway which the police identified as registered to a local criminal constituted an articulable fact from which a reasonable inference could be drawn that an individual was present that posed a danger to those on the arrest scene).

6. Defendant's residence was equipped with external surveillance cameras. [Doc. 23 at PageID.173]. But there was no testimony that anyone remained in the trailer to use them after Defendant had been arrested.

7. In support of its argument that the protective sweep was justified by the surveillance cameras, the United States cites *United States v. Manning*, 2015 WL 807574 (E.D. Ky. Feb. 23, 2015), aff'd, 652 F. App'x 397 (6th Cir. 2016). [Doc. 25].

In *Manning*, officers arrived at Manning's residence in response to a noise complaint. In the parking area, they talked to an individual who admitted he was there to purchase drugs and that had purchased drugs there in the past. The officers knocked on the front door and heard activity inside, but nobody answered. They smelled an odor consistent with the manufacture of methamphetamine and noticed multiple surveillance cameras on the property. The United States' reliance on *Manning* is unpersuasive because neither the Eastern District of Kentucky nor the Sixth Circuit indicated (in light of

9

the ample evidence of the presence of other persons) that the presence of surveillance cameras was essential to its finding that the protective sweep was justified.

8. The United States cites two cases which suggest that the protective sweep was justified because Defendant's residence was a known drug distribution point. But, even if that was the case during the period of the controlled purchases, there was no testimony indicating that it remained the case approximately five months later when the arrest and protective sweep occurred.

In *United States v. Yarbrough*, 961 F.3d 1157 (11th Cir. 2020), police received a tip that there was "lots of traffic" at Yarbrough's home. That same day, police went to investigate. Mr. Yarbrough and two other men were still in the yard. In the present case, in contrast, there was no evidence that anyone other than Defendant was present.

*United States v. Jones*, 667 F.3d 477 (4th Cir. 2012) is distinguishable because, on the day of the arrest, "recent surveillance" had revealed "known drug users were frequenting the house, some who were known to carry firearms; information that a fugitive from Georgia was staying in the [Jones] residence; and the presence of seven motorized vehicles near the residence and on the property."

9. To prove that a protective sweep was justified, the United States must show more than the arrestee's "own dangerousness," "more than ignorance or a constant assumption" that another person is in the residence, and more than a feeling of being "particularly vulnerable" due to physical position in relation to the residence. *United States v. Archibald*, 589 F.3d 289, 299-300 (6th Cir. 2009).

10. As noted above, Sgt. Jones was specially tasked with officer safety. [Doc. 23 at PageID.125, 171-72]. He and Detective Jones performed the protective sweep at issue. When asked if he had specific information saying that someone else was inside the trailer, he responded "I had no specific information saying there was not anyone inside that trailer also." [Doc. 23 at 102-03].

Sgt. Jones' point is well taken. In a sense, police officers bore the safety risk that resulted from the delay due to the tornado (and thus the staleness of their information) and the risk inherent in

10

executing an arrest warrant in a rural setting, with surrounding outbuildings in which another person could hide. But, as in *Colbert*, which held that the protective sweep was not justified, "we recognize that police officers have an incredibly difficult and dangerous task and are placed in life threatening situations on a regular basis," but the Fourth Amendment does not always allow them to "reduce the danger inherent in the job … in every situation in which they must act." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996).

11. The United States did not carry its burden of proving that the protective sweep was justified.

### RECOMMENDATION

For the foregoing reasons, the RECOMMENDATION will be that the Court GRANT Defendant's motion to suppress [Doc. 13].

July 19, 2023

Lanny King, Magistrate Judge
United States District Court

### NOTICE

Under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(1), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984).

July 19, 2023

Lanny King, Magistrate Judge
United States District Court