**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

UNITED STATES OF AMERICA

    v.                                                                                                                               NO. 5:22-CR-51-BJB

ALAN C. ROGERS

## MEMORANDUM OPINION & ORDER

      Magistrate Judge King recommended that the Court suppress evidence seized from Alan Rogers's trailer after a warrantless post-arrest "protective sweep." Report & Recommendation (DN 28) at 1–2. Judge King heard testimony from several officers and narrowed the issues to a single legal question: "whether the warrantless protective sweep of Defendant's residence … was justified." *Id.* at 5. The Government doesn't object to that framing of the legal issue, or to Judge King's careful recitation of the facts. Government's Objection to the R&R (DN 29) at 1–2. The Court therefore relies on the factual record as recited in Judge King's R&R and reviews its legal conclusion de novo. 28 U.S.C. § 636(b)(1)(c).

      The U.S. Constitution's Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" Typically, a reasonable search is one justified by a search warrant: "Except in certain well-defined circumstances, a search or seizure … is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).

      In its investigation of Rogers, the Kentucky State Police (apparently operating through a task force of sorts) *did* obtain a warrant—but it was a warrant to arrest, not to search. And that warrant didn't justify intrusion into the trailer because the officers had already arrested Rogers in his driveway without incident.[1] To justify the

---

[1] The arrest warrant in the record (DN 13-2) is, in some limited respects, framed as a search warrant. But that warrant authorized officers to search the property *for Rogers* in order to arrest him. *See* Affidavit, *id.* at 1 ("This search warrant is requested to make entry into the home to arrest Rogers on the parole violation warrant as well as three more arrest warrants."). It identifies no "papers" or "effects" to be searched or seized. And by the time the officers entered the trailer they had of course already arrested Rogers in the driveway, so they didn't need to enter to look for him. For these reasons and perhaps others, the Government hasn't relied on the warrant to justify the sweep of the trailer. *See* DN 28 at 3 ("[T]he United States accepts that the first search warrant was conditioned upon needing to enter Defendant's residence to arrest him, but the condition did not apply because Defendant

1

search and admission of its fruits, therefore, the U.S. Attorney instead relies on an exception to the warrant requirement for a so-called protective sweep—a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Such a search, the Supreme Court has held, does not violate the Fourth Amendment if law enforcement officers have a reasonable suspicion "that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 327.

That suspicion, moreover, must be supported by "specific and articulable facts" and "rational inferences from those facts." *Id.* The dangerousness of the arrested individual is "irrelevant" to the reasonable-suspicion inquiry (because the subject is already in custody), as is the possibility that unknown third parties are present (which is practically *always* a risk and could be used to justify all manner of sweeps the Constitution would otherwise prohibit). *United States v. Colbert*, 76 F.3d 773, 777, 778 (6th Cir. 1996). Instead, "[t]he facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest[.]" *Id.* at 777.

After Trooper Propes arrested Rogers in his driveway, officers immediately entered his trailer, located about 20 yards away from where Rogers was standing. DN 28 at 2–3. In response to Rogers's motion to suppress evidence found in the house,[2] Judge King correctly recognized that the officers lacked "'a specific, reasonable basis for believing that they were in danger from persons inside.'" DN 28 at 6 (quoting *Colbert*, 76 F.3d at 776) (cleaned up).

Seven officers testified at the suppression hearing.[3] Yet "none of the seven," Judge King noted, "identified 'articulable facts which, taken together with the

---

had already been arrested when Sgt. Jones and Detective Jones entered."); DN 29 at 2 ("The crux of the issue before this Court is whether the protective sweep was justified.").

[2] The initial sweep of the trailer led indirectly to the seizure of the evidence Rogers seeks to suppress: "The protective sweep of Defendant's residence resulted in discovery in plain view on the kitchen table of a clear plastic bag containing what appeared to be marijuana, rolling papers, a glass pipe that had a burnt white residue in it, and a set of triple beam scales." DN 28 at 3 (quotation marks omitted). The officers also discovered "a multi colored glass pipe used for smoking marijuana" "on the front porch." *Id.* But that is not the evidence at issue here; Detective Wright used these plain-view discoveries to obtain a search warrant for Rogers's trailer that turned up evidence "supporting the counts in this Court, i.e., 50 grams or more of methamphetamine, a Cobra .380 firearm and a Colt .357 firearm with an obliterated serial number." *Id.* Besides the protective-sweep rationale, the United States has not advanced any other arguments that the second warrant is valid or that the evidence recovered while executing that warrant should not be suppressed. DN 29 at 2.

[3] Kentucky State Police Trooper William Propes, KSP Detective Matthew Foster, Mayfield Police Department Detective Richard Wright (assigned to the KSP as a task force officer), KSP Sergeant Zachary Jones, KSP Detective Daniel Jones, KSP Officer T.J. Williams, and Livingston County Sheriff's Office Chief Deputy Devin Brewer all testified at the suppression hearing before Judge King.

2

rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene.'" DN 28 at 8 (quoting *Buie*, 494 U.S. at 334). "No officer testified that he observed another individual on the property or that he heard noises indicating that someone else was present." *Id.* Indeed, when Detective Wright surveilled the property that morning, he saw only one car enter the property, and it left several minutes later. Transcript (DN 23) at 58–60. What's more, Detective Wright—who briefed the other officers—believed that Rogers lived alone. *Id.* at 62. And when the officers arrested Rogers, he told them—before they conducted the protective sweep—that no one else was present on the property. *Id.* at 15 (Trooper Propes examination). This testimony supports Judge King's conclusion that the officers' protective sweep was *not* supported by a reasonable and articulable suspicion of danger. To the contrary, the testimony describes a sweep that resembles the one Sixth Circuit held unconstitutional in *Colbert*: a protective sweep based on an unsubstantiated concern that "somebody might still be in [an apartment]." 76 F.3d at 775 (cleaned up).

  Resisting this conclusion, the United States objected to the R&R based on six facts that, in its view, establish reasonable suspicion that someone in the trailer posed a danger to the officers who arrested Rogers: (1) "the rural setting," (2) "knowledge of prior drug trafficking," (3) "prior presence of additional individuals" at the trailer, (4) "presence of firearms," (5) "multiple vehicles in the driveway," and (6) "visible security cameras." DN 29 at 4. Whether considered together or separately, however, these facts do not support the purported need for an immediate and warrantless search of the trailer to avoid "suspicion of danger from attack by a third party during the arrest." *Colbert*, 76 F.3d at 777.[4]

  *First*, the United States appears to suggest that a protective sweep was justified because the officers felt particularly vulnerable based on their location in "the rural setting" of Livingston County. But it does not cite any legal authority supporting this position. And allowing officers to conduct a warrantless protective sweep simply because they are in a relatively remote area would "rende[r] the Fourth Amendment irrelevant" in large swaths of the United States. *United States v. MacWilliams*, 2006 WL 8426148, at *12 (N.D. W. Va. Sept. 8, 2006).

  *Next*, the Government's second and third facts—"knowledge of prior drug trafficking" and "prior presence of additional individuals" at the trailer—refer to controlled buys conducted months before. At the time of the arrest and search, the officers "didn't have any information … that there was going to be a drug deal going down that day." DN 23 at 71–72. And the pre-arrest surveillance and Rogers's post-arrest statements *undermined* rather than supported any concern that someone

---

[4] Judge King correctly concluded that resolving the question of "whose perspective the reasonableness of the protective sweep should be judged" is unnecessary here. DN 28 at 8. The parties don't discuss whether the answer is one of the officers who conducted the sweep, the entire squad, or a hypothetical objective reasonable observer. That is because "from any or all perspectives," Judge King reasoned, "a protective sweep was not justified." *Id.*

dangerous was present in the trailer when the officers conducted the sweep. *See id.* at 15, 58, 62. In similar circumstances, the Sixth Circuit has held that a defendant's "possible involvement in drug trafficking" was "not [an] appropriate fac[t] to consider when determining whether the arresting officers reasonably believed that *someone else inside the house* might pose a danger to them." *Colbert*, 76 F.3d at 777 (emphasis in original). So these points also do not support the Government's ultimate position that a protective sweep was warranted.

*Fourth*, the alleged "presence of firearms" in Rogers's home is similarly unhelpful. Detective Wright testified that, before executing the arrest warrant, he informed all the officers involved that "there was a very high possibility that there were more firearms in [Rogers's trailer.]" DN 23 at 41. But this doesn't support reasonable suspicion justifying their entry into that trailer. Wright's understanding rested on stale information: Rogers' 2015 conviction for being a felon in possession of a firearm, *id.* at 34; a confidential informant's statement to Wright following a controlled buy "that there were firearms in the residence," *id.* at 38; and Rogers's sale of a .22 rifle to the informant during a December 2021 controlled buy, *id.* at 38, 66. Otherwise, Wright admitted that he lacked "any other information" since 2021 "that Mr. Rogers may have had a weapon in the [trailer]." *Id.* at 66–67. And Sergeant Jones candidly admitted that he "didn't have any" "specific information … about the location of weapons on the property." *Id.* at 94. So the record hardly supports the Government's position that the officers were motivated to enter the house based on a contemporaneous concern regarding the weapons it may have contained. Even assuming they were, moreover, the "presence of firearms" in a home is "irrelevant" to the reasonable-suspicion inquiry; it says nothing about whether another individual was present inside when the officers arrested Rogers outside. *See Colbert*, 76 F.3d at 777.

*Fifth*, the Government points to a white pickup truck and two motorcycles parked on Rogers's property. DN 23 at 8, 43. But the officers had seen the pickup truck parked in the same location during each of the controlled buys conducted months earlier, suggesting that the pickup truck either belonged to Rogers or was inoperable, or both. Certainly nothing suggested that it belonged to an unseen confederate inside. *See id.* at 67. The record doesn't indicate that someone besides Rogers might've owned the motorcycles; nor does it otherwise suggest that someone dangerous might be present and unaccounted for. DN 28 at 9 ("[T]here was no testimony that [the motorcycles] belonged to someone other than [the] Defendant."). The Government wisely doesn't advance the position that any vehicles parked near an outdoor arrest would justify the search of a nearby residence, a proposition that would quite literally open the door to all manner of indoor searches incident to outside arrests. Here the officers lacked any reason to believe the pickup truck or motorcycles belonged to, say, "a local criminal" parked in an arrestee's driveway that might support an inference that the criminal was present in the home. *United States v. Stover*, 474 F.3d 904, 911–12 (6th Cir. 2007).

4

*Finally,* the security cameras provide scant support for a reasonable suspicion of danger. Their presence does not suggest that multiple people lived in the trailer, much less that someone else was in the trailer monitoring those cameras or otherwise preparing to harm the officers. Indeed, one of the officers testified that the cameras "could have been streaming to [Rogers's] iPhone. They could have been streaming to somebody's phone." DN 23 at 103 ("You never know.").

\* \* \*

At bottom, the Government attempts to justify the protective sweep based on the *lack* of information available to law enforcement at the time. Those officers did not know whether anyone was inside, who owned the motorcycles, or who might be watching on the security cameras. DN 23 at 8, 16. Given this uncertainty and the danger inherent in such fraught law-enforcement activities, their desire to secure the area—out of an abundance of caution—was hardly irrational.

But the Fourth Amendment doesn't impose rational-basis review. And a protective sweep must rest on the presence, not the absence, of articulable facts—the opposite of the default rule the Government effectively advances. Officers must know (or at least reasonably suspect) facts that support a protective sweep, rather than rely on unknowns to enter a home without a warrant. The "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *Colbert*, 76 F.3d at 778. Specific, articulable facts are required: "more than ignorance or a constant assumption that more than one person is present in a residence." *United States v. Archibald*, 589 F.3d 289, 300 (6th Cir. 2009). Those facts are absent from the record here.[5] Without them, the officers lacked the required suspicion of danger to enter Rogers's trailer. And that means the protective sweep of Rogers's trailer contravened the Fourth Amendment.

So the Court overrules the United States' objections (DN 29), adopts Judge King's report and recommendation (DN 28), and grants Rogers's motion to suppress (DN 13).

---

[5] The officers' own testimony makes this clear. *See* DN 23 at 16 (Trooper Propes "had not observed anyone else on the property" and "didn't hear any noises to indicate that other individuals may have been on the property."), *id.* at 31–32 (Detective Foster did not see or hear "anything specifically that indicated … there were other individuals on the property[.]"), *id.* at 71–72 (Detective Wright "didn't have any information … that there were indeed going to be other people on the property that day"), *id.* at 102–03 (Sergeant Jones had "no specific information" that someone was inside the trailer), *id.* at 111–12 (Detective Jones had "no information that there were other individuals on the property"), *id.* at 121 (Chief Deputy Brewer "didn't have any information" that other individuals were on the property).